*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0059p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JUANA VILLEGAS,

        *Plaintiff-Appellee*,

    *v.*

THE METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY,

        *Defendant-Appellant*.

No. 11-6031

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:09-cv-219—William J. Haynes, Jr., District Judge.

Argued: October 12, 2012

Decided and Filed: March 4, 2013

Before: CLAY, GIBBONS, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Allison L. Bussell, DEPARTMENT OF LAW OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Nashville, Tennessee, for Appellant. Phillip F. Cramer, SHERRARD & ROE, PLC, Nashville, Tennessee, for Appellee. **ON BRIEF:** Allison L. Bussell, Kevin C. Klein, DEPARTMENT OF LAW OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Nashville, Tennessee, for Appellant. Phillip F. Cramer, John L. Farringer IV, William L. Harbison, Ryan T. Holt, SHERRARD & ROE, PLC, Nashville, Tennessee, Elliott Ozment, Nashville, Tennessee, for Appellee. Paul W. Ambrosius, TRAUGER & TUKE, Nashville, Tennessee, George E. Barrett, BARRETT JOHNSTON, LLC, Nashville, Tennessee, Farah C. Diaz-Tello, NATIONAL ADVOCATES FOR PREGNANT WOMEN, New York, New York, Alexa Kolbi-Molinas, ACLU FOUNDATION, New York, New York, Eric Schnapper, Maureen Howard, UNIVERSITY OF WASHINGTON SCHOOL OF LAW, Seattle, Washington, Rebecca S. Jones, Seattle, Washington,, for Amici Curiae.

    CLAY, J., delivered the opinion of the court, in which GIBBONS, J., joined. WHITE, J. (pp. 25–30), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.   Plaintiff Juana Villegas brought suit under 42 U.S.C. § 1983, claiming violations of her Eighth Amendment rights (made applicable to pretrial detainees through the Fourteenth Amendment) as a result of her being restrained and shackled prior to and following giving birth while in the custody of law enforcement authorities employed by Defendant Metropolitan Government of Nashville and Davidson County.   On cross-motions for summary judgment, the district court granted summary judgment to Plaintiff as to liability on both her shackling and denial-of-breast-pump claims.   The case went to trial only on damages, and the jury awarded Plaintiff $200,000.   For the reasons that follow, we **REVERSE** the district court's grant of summary judgment to Plaintiff and **REMAND** for further proceedings.

**BACKGROUND**

Plaintiff Juana Villegas's saga began on July 3, 2008 when her car was stopped by Berry Hill, Tennessee police officer Tim Coleman.   At the time of the stop, Plaintiff was nine months pregnant.   When Plaintiff failed to produce a valid driver's license, Coleman arrested Plaintiff and transported her to the jail operated by the Davison County Sheriff's Office ("the jail").[1]   Once there, a jail employee, working as an agent of the United States through Immigration and Customs Enforcement's 287(g) program, *see* 8 U.S.C. § 1357(g), inquired into Plaintiff's immigration status and determined that Plaintiff was not lawfully in the United States.   Due to her illegal status, a detainer was placed on Plaintiff, which meant that federal immigration officials would delay taking any action until after resolution of Plaintiff's then-pending state charges.   After being unable to post bond, Plaintiff was, as a result of the immigration detainer, classified as a medium-security inmate.

_____

[1]The jail accepts and houses individuals arrested by local law enforcement agencies without inquiry into whether the arrest was proper.

Plaintiff was held in the jail from Thursday, July 3, 2008 until late on Saturday, July 5, 2008.  At 10:00 p.m. on July 5, 2008, Plaintiff informed a jail guard that her amniotic fluid (or "water") had "broke" and that she was about to have her baby. Plaintiff was transported to the jail infirmary where a nurse confirmed that Plaintiff's water had broken and summoned an ambulance to take Plaintiff to Nashville General Hospital (the "Hospital").  For transportation in the ambulance, Plaintiff was placed on a stretcher with her wrists handcuffed together in front of her body and her legs restrained together.  According to Defendant Metropolitan Government of Nashville and Davidson County, because hospitals are "conducive to security breaches including escape," medium-security inmates at hospitals remain shackled until they return to jail. (R. 79, Decl. of Richard Stalder, at PID# 680.)  Two male officers (Matthew Barshaw and Thomas Farragher) accompanied Plaintiff in the ambulance to the Hospital with Barshaw riding in the front seat and Farragher in the back with Plaintiff.  Barshaw questioned his supervisor about the leg restraints because "what if all of a sudden the baby started [and it] took more time to unrestrain these restraints in the back of the ambulance."  (R. 86-1, Dep. of Matthew Barshaw, at PID# 845.)

Upon arriving at the Hospital, Farragher removed Plaintiff's shackles at the request of Hospital staff so that Plaintiff could change into a hospital gown.  Barshaw and Farragher remained in the room with Plaintiff with their backs turned as she changed, and after she finished, they again restrained her.  Shortly after Plaintiff arrived at the Hospital, officer Brandi Moore arrived to relieve Barshaw and Farragher. Farragher informed Moore that Plaintiff was a "medium-security inmate" with a "hold" or "detainer" in her file and gave Moore a "charge sheet," indicating Plaintiff's name, charge, and custody level.  After Farragher and Barshaw left, Moore removed Plaintiff's handcuffs but kept one of Plaintiff's legs restrained to the hospital bed.

At some point during Moore's shift, Moore overheard Hospital staff talking to a doctor about a "No Restraint Order" but claims that she never received such an order from the Hospital.  Additionally, Moore admitted to having been told by a nurse that she "shouldn't put leg irons on [Plaintiff]," but the conversation ended there.  At 11:20 p.m.,

a Hospital doctor signed a physician's order stating: "Please remove shackles," and this order was placed in Plaintiff's hospital file, though never specifically given to any officer. (R. 78-7, Pl.'s Hospital Records: 7/5/08, at PID# 672.) Moore was relieved by officer David Peralta at 11:00 p.m. on June 5th and told Peralta to "be prepared for a no restraint order." (R. 93, Pl.'s Resp. to Def.'s Statement of Undisputed Facts, at PID# 1725.)

Shortly after the shift change, Peralta removed Plaintiff's restraints. According to hospital records, when the shackles were removed, Plaintiff had only dilated to 3 centimeters ("cm"). Plaintiff did not become dilated to 4 cm, a point that Defendant contends is medically relevant, until 11:45 p.m. It was around this time that Plaintiff also first requested pain medication, which she received in the form of an epidural. Plaintiff gave birth without any complications at approximately 1:00 a.m on July 6, 2008—roughly two hours after Peralta removed her shackles. Plaintiff remained unshackled until shortly before Peralta's shift ended at 7:00 a.m., when he re-restrained Plaintiff to the bed at one of her ankles. Plaintiff was never handcuffed postpartum.

At the time of Plaintiff's discharge from the Hospital, Defendant did not allow Plaintiff to take the breast pump that the Hospital staff had provided her. Defendant justified this based on safety concerns, and that under its policy, it did not consider a breast pump to be a "critical medical device," which would have allowed Plaintiff to take it back to the jail.

In March 2009, Plaintiff filed suit in the United States District Court for the Middle District of Tennessee asserting various claims against Defendant.[2] Following discovery, Plaintiff and Defendant cross-moved for summary judgment. On April 27, 2011, the district court granted Plaintiff's partial summary judgment motion on the basis that Defendant was deliberately indifferent to Plaintiff's medical needs by shackling her while she was in labor and postpartum and denying her a breast pump on her release from the Hospital. *See generally Villegas v. Metro. Gov't of Nashville & Davison Cnty.*,

---

[2]Other defendants were named in the suit as well but they are not parties to this appeal.

789 F. Supp. 2d 895 (M.D. Tenn. 2011).  The case proceeded to a trial on damages, and after a three-day trial, the jury awarded Plaintiff $200,000.  Defendant timely appealed, invoking this Court's jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

### I.      Deliberate Indifference

Plaintiff raises two claims alleging that Defendant violated her rights.  First, she claims that by shackling her while she was in labor and postpartum, in the manner it did, Defendant was deliberately indifferent to her need to be unrestrained during this time.  Second, Plaintiff claims that by denying her a breast pump, Defendant was deliberately indifferent to her medical needs.  The district court granted Plaintiff summary judgment on both claims.

#### A.      Standard of Review

We review a district court's grant of summary judgment *de novo*, *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 324 (6th Cir. 2011), applying the same standards as the district court.  *Natron Corp. v. STMicroelecs., Inc.*, 305 F.3d 397, 403 (6th Cir. 2002).  Summary judgment is appropriate "if the  if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, 'show that there is no genuine issue as to any material fact'" such that "'the movant is entitled to a judgment as a matter of law.'"  *Ventas*, 647 F.3d at 324 (quoting  Fed. R. Civ. P. 56(a)).  "A genuine issue of material fact exists when there are 'disputes over facts that might affect the outcome of the suit.'" *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In reviewing a summary judgment decision, this Court views the facts and all inferences to be drawn from the facts in the light most favorable to the party against whom summary judgment was entered.   *Bell v. United States*, 355 F.3d 387, 392 (6th Cir. 2004).

### B.      General Principles

"The Eighth Amendment prohibition on cruel and unusual punishment protects prisoners from the 'unnecessary and wanton infliction of pain.'" *Baker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Pretrial detainee claims, though they sound in the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983), are analyzed under the same rubric as Eighth Amendment claims brought by prisoners. *See Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985) (citing *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)). Fundamentally, the "'concept underlying the Eighth Amendment . . . is nothing less than the dignity of [hu]man[kind].'" *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)).

Proving an Eighth Amendment claim requires that the plaintiff make a showing of deliberate indifference. *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)); *see also Estelle v. Gamble*, 429 U.S. 97 (1976). Deliberate indifference has two components to it: objective and subjective. *Harrison*, 539 F.3d at 518. The objective component first demands a showing that the detainee faced a substantial risk of serious harm. *Id.* But the objective component is not met by proof of such a substantial risk of serious harm alone. The objective component further "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency"—that is, it "is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Therefore, the objective component of deliberate indifference is met upon a showing that a detainee faced a substantial risk of serious harm and that such a risk is one that society chooses not to tolerate.

As to the subjective component, a plaintiff must show that the defendant had "a sufficiently culpable state of mind." *Harrison*, 539 F.3d at 518 (internal quotation marks omitted). This state of mind is shown "where 'the official knows of and disregards'" the substantial risk of serious harm facing the detainee. *Id.* (quoting *Farmer*, 511 U.S. at

837).  That is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Direct evidence about a defendant's knowledge is not necessary, but rather, the knowledge aspect of the subjective component can be inferred from the obviousness of the harm stemming from the risk.  *See Hope*, 536 U.S. at 738.

### C.     Shackling Claim

Plaintiff predicates her first deliberate indifference claim on her being shackled during labor and postpartum recovery.  In bringing such a claim, Plaintiff finds herself in the recent "burgeoning movement to end the practice of shackling pregnant women prisoners, particularly during labor and delivery."  *See* Elizabeth Alexander, *Unshackling Shawanna: The Battle Over Chaining Women Prisoners During Labor and Delivery*, 32 U. Ark. Little Rock L. Rev. 435, 436 (2010).  Though the push to end the practice is fairly new, sadly, it is a practice that has been around for at least a century. *See generally* Priscilla A. Ocen, *Punishing Pregnancy: Race, Incarceration, and the Shackling of Pregnant Prisoners*, 100 Cal. L. Rev. 1239 (2012).  In spite of this history, the law on the shackling of pregnant women is underdeveloped, and this Court has not previously decided a deliberate indifference claim based on the practice.  Therefore, we must at the outset determine a framework under which to analyze such a claim.

### 1.     Framework

In dealing with deliberate indifference claims in the past, this Court has enumerated some specific types of claims for factual scenarios that frequently arise. These types include, but are not limited to, conditions-of-confinement, excessive-force, and medical-needs.  *See, e.g.*, *Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (conditions-of-confinement, excessive-force); *Harrison*, 539 F.3d at 518 (medical-needs).  The district court as well as the parties in their briefing discuss this as a medical-needs claim, *Villegas*, 789 F. Supp. 2d at 911–12, but as we explain below, the nature

of Plaintiff's claim does not quite square with our medical-needs jurisprudence nor our other refinements of the general deliberate indifference principles.

A typical medical-needs claim deals with a deprivation of medical care like the one at issue in *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004). In that case, a detainee requested medical care after experiencing over twenty-four hours of "sharp" and "extreme" pain in his lower abdomen. *Id*. at 894 (internal quotation marks omitted). No care was given to the detainee, despite multiple further complaints, until two days after the detainee's first complaint. *Id*. After three days of pain, a jail nurse diagnosed the plaintiff-detainee with appendicitis. *Id*.

Another typical medical-needs claim involves the interference with a prescribed treatment plan. A good example came to this Court in *Byrd v. Wilson*, 701 F.2d 592 (6th Cir. 1983) (per curiam). In *Byrd*, a prisoner complained of stomach pain. *Id*. at 594. After being treated at an outside hospital, the prisoner "was diagnosed as having post-hepatitic type cirrhosis of the liver for which medication and a low-sodium, high-protein diet were prescribed." *Id*. Upon return to the prison, however, two days elapsed before he was able "to get his medicine and his diet." *Id*.

In light of those common factual scenarios, this Court has stated that the objective component of deliberate indifference in a medical-needs case is met where a plaintiff produces evidence of a "serious medical need." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 896 (6th Cir. 2004). We have further defined a serious medical need as either "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison*, 539 F.3d at 518 (quoting *Blackmore*, 390 F.3d at 897). The problem with viewing a shackling claim, like Plaintiff's, solely as a medical-needs claim is that it does not quite square with either of the typical factual scenarios or the definition of "serious medical need" from *Harrison* and *Blackmore*. A shackling claim does not necessarily involve the denial of or interference with medical treatment; rather, it may be premised on the notion that the shackles increase Plaintiff's risk of medical complications. We should hasten to add that there may be circumstances where

shackling could interfere with medical treatment—where, for example, the shackles are not removed so that the medical treatment may proceed unimpeded; however, such were not the circumstances in this case.

This problem led one court to analyze the shackling claim it faced as a conditions-of-confinement claim. *See Women Prisoners of D.C. Dep't of Corr. v. Dist. of Columbia*, 877 F. Supp. 634, 668–69 (D.D.C. 1994), *modified in part on other grounds*, 899 F. Supp. 659 (1995), *vacated in part and remanded on other grounds*, 93 F.3d 910 (D.C. Cir. 1996)). Under our case law, the objective component of a conditions-of-confinement claim is proven where the detainee or prisoner is denied "the minimal civilized measure of life's necessities." *Barker*, 649 F.3d at 434 (internal quotation marks omitted). This includes deprivations of "adequate food, clothing, shelter, [medical care, and safety]." *Farmer*, 511 U.S. at 832. A typical conditions-of-confinement case is *Spencer v. Bouchard*, 449 F.3d 721 (6th Cir. 2006), *abrogated on other grounds by Jones v. Bock*, 549 U.S. 199 (2007), where the prisoner complained of being held in an unbearably cold and leaky cell. *Id*. at 728–29. While a shackling claim does in some respects resemble some of our conditions-of-confinement cases, *see, e.g.*, *Barker*, 649 F.3d at 434 (analyzing the use of handcuffs on a mentally ill prisoner under a conditions-of-confinement, as well as excessive-force, rubric), the nature of the medical proof offered by Plaintiff is different than we have previously addressed in the conditions-of-confinement context.

Similarly, we believe that the excessive-force type of claim is also not well adapted for analysis of Plaintiff's claim. The inquiry in excessive-force cases is about "'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm,'" a formulation that does not harmonize with the way Plaintiff has presented her claim. *Id*. (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). In sum, it seems to us that none of the refinements we have made to the general deliberate indifference principles in order to more easily analyze common factual scenarios are particularly well-suited to the theory and proof offered by Plaintiff.

The Eighth Circuit in *Nelson v. Correctional Medical Services*, 583 F.3d 522 (8th Cir. 2009) (en banc), seems to have similarly recognized the crossover nature of a pregnant shackling claim. In dealing with such a claim the Eighth Circuit identified the "relevant questions" as: "(1) whether [the defendant] had a serious medical need or whether a substantial risk to her health or safety existed, and (2) whether [the official] had knowledge of such serious medical need or substantial risk to [the plaintiff's] health or safety but nevertheless disregarded it." *Id*. at 529. This formulation used by the *Nelson* court combines both medical-needs language ("serious medical need") as well as language that points to conditions-of-confinement ("substantial risk to health or safety"). In light of this language, rather than attempt to pigeonhole Plaintiff's shackling claim into a more specific subcategory of deliberate indifference claims, we think it best to analyze her claim under the general deliberate indifference principles.[3] *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) ("Whether one characterizes the treatment received by the prisoner as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the deliberate indifference standard articulated in *Estelle*." (alteration and internal quotation marks omitted)).

Consistent with the general principles discussed above, we analyze Plaintiff's claim in two steps, addressing first the objective component and then the subjective one. *Harrison*, 539 F.3d at 518. On the objective component, we ask whether shackling pregnant detainees in the manner and under the circumstances in which Plaintiff was shackled creates a substantial risk of serious harm that society chooses not to tolerate. *See Helling*, 509 U.S. at 36. On the subjective component, the inquiry is whether the

---

[3]We note that while *Nelson* is informative with respect to the appropriate framework to apply, the majority would not go as far as the dissent in making *Nelson* dispositive of this case. *See* Dissent at 25–27. There are two key distinctions between this case and *Nelson* that are relevant. First, the factual and procedural posture of *Nelson* was different than the one we face in the instant case. *Nelson* came to the Eighth Circuit on a grant of qualified immunity, *Nelson*, 583 F.3d at 525; therefore, all facts were viewed in the light most favorable to the detainee. *Id.* at 530. In the instant case, we must instead give the officers, as the non-moving party, the benefit of viewing their facts in the more favorable light. *Bell*, 355 F.3d at 392. Second, *Nelson* did not involve a potential flight risk. *Nelson*, 583 F.3d at 531. The facts of *Nelson* are therefore quite different than the facts of this case where Plaintiff had an immigration detainer placed on her due to her previous removal from the country. *See infra* n.5. Finally, it is worth pointing out that the *Nelson* court did not, as the district court did in this case, find that the detainee was entitled to judgment as a matter of law. Instead, the Eighth Circuit concluded that summary judgment was *not* appropriate at that time. *See id.* at 534. Considering these differences, it becomes clear that the law is not decidedly one-sided in Plaintiff's favor as the dissent purports it to be.

officers were aware and understood (or should have been aware and understood) that they were exposing Plaintiff to a substantial risk of serious harm. *Farmer*, 511 U.S. at 837.

### 2.          Analysis

#### a.          Objective Component

In attempting to prove the objective component of her shackling claim, Plaintiff points us to prior pregnancy shackling cases, like *Nelson,* as well as statements from notable public health organizations. Turning first to the case law, each of the three courts to deal with a deliberate indifference shackling claim found the practice of shackling women in labor to be violative of contemporary standards of decency.

In the 1994 *Women Prisoners* case, the District Court for the District of Columbia addressed the claim of a class of pregnant women prisoners that a prison unconstitutionally shackled them "in the third trimester of pregnancy and immediately after delivery." 877 F. Supp. at 668. Following a bench trial, the court concluded that the prison's shackling practice "pose[d] a risk so serious that it violates contemporary standards of decency." *Id.* In so doing, the court stated that it understood that prisons "may need to shackle a woman prisoner who has a history of assaultive behavior or escapes. In general, however, the physical limitations of a woman in the third trimester of pregnancy and the pain involved in delivery make complete shackling redundant and unacceptable in light of the risk of injury to a woman and baby." *Id.*

Next, in 2009, the en banc Eighth Circuit determined that summary judgment was inappropriately granted to a prison where a pregnant woman was shackled "well into the final stage of labor" (7–8 cm dilated). *Nelson*, 583 F.3d at 525–27 & n.1. Specifically, the *Nelson* court found that there were factual disputes that precluded summary judgment but held that "absent clear evidence that she is a security or flight risk," a prisoner's "protections from being shackled during labor had . . . been clearly established by decisions of the Supreme Court and the lower federal courts before September 2003." *Id.* at 533–34.

Similarly, in *Brawley v. Washington*, 712 F. Supp. 2d 1208 (W.D. Wash. 2010), a district court held that fact issues precluded summary judgment, *id.* at 1220–21, where a prisoner was restrained until "just prior to" her "emergency cesarean" and was re-restrained "right after surgery," *id.* at 1214. Before doing so, the *Brawley* court concluded that "[c]ommon sense, and the [department of corrections'] own policy, tells us that it is not good practice to shackle women to a hospital bed while they are in labor," *id.* at 1219, and moreover, that "[p]laintiff has made a sufficient showing that by April of 2007[,] shackling inmates while they are in labor was clearly established as a violation of the Eighth Amendment's prohibition against cruel and unusual punishment," *id.* at 1221.

All of these courts found that shackling the pregnant women under the circumstances of their respective cases violated the Eighth Amendment. In addition to these analogous cases, as the Eighth Amendment "'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society,' . . . an assessment of contemporary values concerning the infliction of a challenged sanction is relevant." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (quoting *Trop*, 356 U.S. at 101). In this vein, Plaintiff has adduced evidence from the American Medical Association, the American College of Obstetricians and Gynecologists, the United Nations, and Amnesty International decrying the practice of shackling pregnant women, especially while in labor.

In its *Standard Minimum Rules for the Treatment of Prisoners*, the United Nations stated that restraints including handcuffs and leg irons should only be used "[a]s a precaution against escape," "[o]n medical grounds by direction of the medical officer," or "if other methods of control fail, in order to prevent a prisoner from injuring himself or others or from damaging property." E.S.C. Res. 663 C (XXIV) (July 31, 1957), 2076 (LXII) (May 13, 1977), at Rule 33, *available at* http://www2.ohchr.org/english/law/treatmentprisoners.htm.

With respect to pregnant detainees, the American Medical Association has passed a resolution that provides:

> No restraints of any kind shall be used on an inmate who is in labor, delivering her baby or recuperating from the delivery unless there are compelling grounds to believe that the inmate presents:
>> An immediate and serious threat of harm to herself, staff or others; or
>> A substantial flight risk and cannot be reasonably contained by other means.

Am. Med. Ass'n, "Shackling of Pregnant Women in Labor," Policy H-420.957 (June 2010), *available at* https://ssl3.ama-assn.org/apps/ecomm/PolicyFinderForm.pl?site=www.ama-assn.org&uri=%2fresources%2fdoc%2fPolicyFinder%2fpolicyfiles%2fHnE%2fH-420.957.htm.

Also with respect to pregnant detainees, the American College of Obstetricians and Gynecologists found:

> Physical restraints have interfered with the ability of physicians to safely practice medicine by reducing their ability to assess and evaluate the physical condition of the mother and the fetus, and have similarly made the labor and delivery process more difficult than it needs to be; thus, overall putting the health and lives of the women and unborn children at risk. . . .

> The practice of shackling an incarcerated woman in labor may not only compromise her health care but is demeaning and unnecessary. . . . Testimonials from incarcerated women who went through labor with shackles confirm the emotional distress and the physical pain caused by the restraints. Women describe the inability to move to allay the pains of labor, the bruising caused by chain belts across the abdomen, and the deeply felt loss of dignity.

Letter from Ralph Hale, Exec. Dir., Am. Coll. of Obstetricians & Gynecologists, to Malika Saada Saar, Exec. Dir., The Rebecca Project for Human Rights (Jun. 12, 2007).

Finally, Amnesty International has formulated a policy directive that states, in relevant part:

> Routine use of restraints on pregnant women is cruel, inhumane and degrading treatment, and given medical and other factors impeding pregnant or birthing women from attempting escape or becoming violent, the presumption must be that no restraints should be applied. . . .

> All Departments of Corrections should have an explicit policy dealing with the use of restraints on pregnant women. The following principles should be incorporated into such a policy:
>> Leg irons, shackles, belly chains or handcuffs behind the body may not be used at any time during pregnancy.
>> For pregnant women in the third trimester no restraints may be applied, including during transportation.
>> Under no circumstances may restraints of any kind may [(sic)] be used on a woman in labor or while she is giving birth.
>> . . .
>> No restraints should be applied while a woman remains in the hospital during recovery . . . .

Amnesty Int'l USA, "Use of Restraints on Pregnant Women in the USA: Policy Guidelines" (2009). However, as the United Nations and American Medical Association recognize, Amnesty International's policy also recognizes that there may be "rare instances" that deviations may be warranted—specifically, "where there are serious and imminent grounds to believe that a woman may attempt to harm herself or others or presents a credible risk of escape that cannot be contained through other methods." *Id.*

Two things are clear from Plaintiff's evidence on the objective component. First, the shackling of pregnant detainees while in labor offends contemporary standards of human decency such that the practice violates the Eighth Amendment's prohibition against the "unnecessary and wanton infliction of pain"—i.e., it poses a substantial risk of serious harm. *See Gamble*, 429 U.S. at 104. The universal consensus from the courts to have addressed this issue as well as the chorus of prominent organizations condemning the practice demonstrates that, without any extenuating circumstances, shackling women during labor runs afoul of the protections of the Eighth Amendment.

Second, it is equally clear, however, from both courts and commentators that the right to be free from shackling during labor is not unqualified. The sources establishing the potential violation also recognize that in certain circumstances, despite the fact that the woman is in labor, shackles may nonetheless be tolerated by society. *See Helling*, 509 U.S. at 36. The United Nations recognizes potential exceptions where the pregnant detainee presents a danger to herself or others and where the detainee poses a flight risk. E.S.C. Res. 663 C (XXIV), 2076 (LXII), at Rule 33. Similarly, the American Medical

Association would permit the shackling of a pregnant detainee where she was shown to be either "[a]n immediate and serious threat of harm to herself, staff or others; or [a] substantial flight risk and cannot be reasonably contained by other means." Am. Med. Ass'n, "Shackling of Pregnant Women in Labor," Policy H-420.957. Finally, though Amnesty International couches its carve-outs in terms of being "rare," it nonetheless would allow restraints "where there are serious and imminent grounds to believe that a woman may attempt to harm herself or others or presents a credible risk of escape that cannot be contained through other methods." Amnesty Int'l USA, "Use of Restraints on Pregnant Women in the USA: Policy Guidelines."

These same caveats are found in the cases applying the Eighth Amendment to shackled pregnant detainees. The court in the *Women Prisoners* case left the door open for a situation where a prison "may need to shackle a woman prisoner who has a history of assaultive behavior or escapes." 877 F. Supp. at 668. Additionally, *Nelson* stated that Eighth Amendment would not afford a detainee a claim where a jail put forth "clear evidence that she is a security or flight risk."[4] 583 F.3d at 534. Therefore, we must consider whether there is evidence in the record of the instant case that supports Defendant's claim that Plaintiff was a flight risk.

Defendant concedes that Plaintiff was restrained because of her status as a medium-security inmate, a status she obtained by virtue of the federal immigration check, which established that she was illegally present in this country, after having been previously removed.[5] As Defendant's expert Richard Stalder, former president of both the American Correctional Association and the Association of State Correctional

---

[4]The court in *Nelson* explicitly noted that the plaintiff in that case "did not present a flight risk or other security concern." 583 F.3d at 534.

[5]The dissent focuses its attention on the fact that Defendants failed, in its words, to "individually assess[ Plaintiff's] flight risk or risk of harm to herself or others" and criticizes Defendants' policy as being "automatic." Dissent at 26–27. But the relevant question is not about the process by which Defendants came to the determination that Plaintiff posed a flight risk. Rather, the relevant question turns on whether, at this stage in the litigation, there is a factual dispute regarding the nature of the flight risk posed by Plaintiff. It is that consideration which bears upon whether society would tolerate Defendants' conduct in this case. *See supra* pp. 14–15 (discussing the qualified nature of the right to be free from shackling during labor). Obviously, this consideration has to be viewed in relation to Plaintiff's previous record; the immigration detainer was only issued for Plaintiff after she was determined, based on Immigration and Customs Enforcement standards, to pose a flight risk.

Administrators, declared, Plaintiff's "security restrictions" (including the restraints) were "consistent with the custody level assignment": medium-security. (R. 79, at PID# 678.) Additionally, with respect to Plaintiff, "the stress of pending deportation could easily promote what otherwise may be uncharacteristic unlawful behaviors, including flight from custody and subsequent illegal activity." (*Id.* at 679.) He added, "The relationship between public safety, custody status, general security practices and restraint policy is strong and justified." (*Id.*) Finally, he opined that the jail's policy was consistent with the American Correctional Association Policy that mirrors the American Medical Association resolution in light of Plaintiff's "custody classification resulting from multiple immigration and customs enforcement violations." (*Id.*) To be sure, this evidence shows that the jail's classification procedures were followed in this case. However, because of Plaintiff's obvious, physical condition as a pregnant woman in labor, a reasonable factfinder could nonetheless conclude that Plaintiff was not a flight risk despite the jail's conformity with its classification procedures. This potential dispute renders summary judgment inappropriate.[6] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### b.      Subjective Component

Turning to the subjective component, as stated above, the question is whether the officers had knowledge of the substantial risk, recognized the serious harm that such a risk could cause, and, nonetheless, disregarded it. *Harrison*, 539 F.3d at 518. On this point, Plaintiff has produced testimony from both fact and expert witnesses in an attempt to prove that Defendant had the knowledge to have "had a sufficiently culpable state of mind." *See id.* (internal quotation marks omitted).

---

[6]The dissent somehow concludes that neither the undisputed evidence about Plaintiff's illegal status and prior removal nor the Defendants' well-qualified expert's opinion is sufficient to create a material factual dispute. Dissent at 27–29. As did the district court, the dissent enmeshes itself in "the weighing of the evidence." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("[T]he weighing of the evidence . . . [is a] jury function[]."). We are not suggesting that Plaintiff cannot argue that she was not a flight risk, but rather, that it would not be unreasonable for the jury to conclude on this evidence that she was indeed a flight risk. *See id.* at 248 ("[S]ummary judgment will not lie if . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Factually, Plaintiff points first to the testimony of Barshaw who admitted to thinking, "what if all of a sudden the baby started [and it] took more time to unrestrain these restraints in the back of the ambulance." (R. 86-1, at PID# 845.) This fairly ambiguous statement is not, however, conclusive enough to show Defendant's subjective awareness as a matter of law. *See* Fed. R. Civ. P. 56(a).

Next, Plaintiff attempts to establish that Defendant was subjectively aware of the risks that the shackles posed by virtue of the fact that Hospital staff ordered the shackles removed. Knowledge of such a "no restraint order" would, at minimum, evince knowledge of a substantial risk of serious harm. *Cf. Gamble*, 429 U.S. at 104–05 (Deliberate indifference can be manifested through "intentionally interfering with the treatment once prescribed.") Plaintiff's evidence on this front, however, falls short. Although it is clear from the record that a no restraint order was placed in Plaintiff's file at 11:20 p.m., no testimony reveals that Defendant or its officers ever knew about the existence of this order. Moore's testimony only discloses her knowledge that Hospital staff were contemplating a no restraint order, not that one was ever disclosed to her. Moore states that she told Peralta that she had been told that Hospital staff "were trying to get a no restraint order but no one had specifically talked to me about it." (R. 86-6, Dep. of Brandi Moore, at PID# 1091.) For his part, Peralta stated that Moore had "said that there was going to be a no restraint order" but does not mention whether he ever saw it. (R. 86-6, Dep. of David Peralta at PID# 1109.) At worst, this evidence confirms Defendant's contention that it never knew about a no restraint order; at best, it shows the existence of a factual dispute concerning Defendant's officers' knowledge.[7]

---

[7]The dissent accuses the majority of disregarding evidence and testimony favorable to Plaintiff, *see* Dissent at 28; this is simply incorrect. What is required on the subjective component is that the defendant have knowledge of the risk and disregards it. *Harrison*, 539 F.3d at 518. The testimony cited by the district court, and relied on by the dissent, suggests that Moore may have "overheard" discussion between the nurses, (R. 86-6, Moore Dep., at PID# 1095; *see also id*. at 1091), and the doctors about a no restraint order, and one nurse purportedly stated that the officers "shouldn't put leg irons on [Plaintiff]." (*Id*. at 1097.) Nowhere in this testimony does it show either that a course of treatment was settled upon, as in *Byrd*, or that Moore was informed about the *risk* associated with the leg irons.

The dissent also seems to fault the majority for failing to take account of the hearsay testimony from Davidson County Sheriff's investigator Michelle Ray. In her deposition, Ray stated that she had in her notes, with respect to an after-the-fact conversation that she had with a nurse, that the nurse told her that the nurse had "tr[ied] to explain to [one of Defendants' officers] that after . . . birth, there's a high risk of clotting." (R. 86-5, Dep. of Michelle Ray, at PID# 1064.) But it was inappropriate for the district court to have considered this evidence in the first place. Such rank hearsay cannot be relied upon by a court when ruling on a summary judgment motion. *Hoover v. Walsh*, 682 F.3d 481, 491 n.34 (6th Cir. 2012).

Both sides also presented expert testimony as to the specific harm faced by Plaintiff and the potential obviousness of this harm to Defendant's officers.[8] *See Hope*, 536 U.S. at 738 (recognizing that the obviousness of the harm can be used to infer subjective knowledge of it).  Plaintiff offered two different witnesses: a gynecologist, Dr. Sandra Torrente, to opine on the physical risks associated with shackling, and a psychiatrist, Dr. Jill DeBona, to opine on the psychological risks.  Defendant also presented a gynecologist, Dr. Bennett Spetalnick.

Spetalnick, who is the head of Obstetrics and Gynecology at Vanderbilt University Medical Center, opined that "[a]lthough the risk of a DVT (deep venous thrombosis) and PE (pulmonary embolism) is increased with pregnancy and postpartum, my medical opinion, based on the literature and personal experience, is that these risks are not enhanced by a leg restraint and/or handcuffs."  (R. 81, Decl. of Bennett Spetalnick, at PID# 700.) Further, "[a]mbulation is encouraged in the peripartum period, but the amount of ambulation recommended to prevent a DVT is not prevented by leg restraints as they were used in [Plaintiff's] situation."  (*Id*.)  Spetalnick explained that "[a]lthough labor is very painful, it is medically anticipated that the pain experienced in latent labor is less severe than that experienced in active labor [(defined as dilation to 4 cm)].  The facts of the case indicate that . . . she was in latent labor until at least 23:30 . . . [and] that all of her restraints were removed prior to active labor."  (*Id*. at 701–02.)  In sum, as to shackling, Spetalnick concluded: "There is no significant risk to the patient with a leg restrained up to the time of delivery and immediately post partum and none in this case with no leg restrained for 7 hrs—2 hrs prior and for 5 hours after delivery." (*Id*. at 700–01.)

Torrente, an assistant professor of Obstetrics and Gynecology at Meharry Medical College, on the other hand, stated: "Placing a pregnant woman in leg irons or shackles increases her risk of developing a potentially life-threatening blood clot.  This risk is increased and present throughout a woman's entire pregnancy; however, it is at

---

[8]Unfortunately, neither party has cited to any authoritative medical literature about the risk of shackling pregnant women in labor.  What has been cited has mostly consisted of conclusory opinions.

the greatest risk post-partum," and therefore women should be "ambulatory . . . as often as possible" during this period. (R. 94-4, Decl. of Sandra Torrente, at PID# 1856.) Additionally, Torrente detailed the importance of being unrestrained due to "potential occurrence of umbilical cord prolapse" and "the increased risk in falling due to a pregnant woman's impaired balance." (*Id.*) Finally, restraints would create "discomfort" and would not allow the woman to "safely handle a newborn child." (*Id.* at 1857.) Torrente further opined that Plaintiff was shackled during "active labor" and because she had previously given birth, "the risk created by shackling her during labor are even greater because of her potential to begin giving birth much sooner following the onset of labor than the average woman in labor." (*Id.* at 1857–58.) Specifically in response to Spetalnick, she disagreed "that there was no significant risk to [Plaintiff] because she happened to be unshackled two hours before she delivered[, and] . . . Spetalnick is incorrect that [Defendant's] conduct did not substantially elevate [Plaintiff's] risk of DVT and PE." (*Id.* at 1857.)

Lastly, psychiatrist DeBona, in detailing the various "episode[s] of shackling" that Plaintiff experienced, described the psychological effects of the shackling on Plaintiff:

> While in the ambulance, [Plaintiff] had to face the terror that her baby might die. She did not realize that an officer was in the ambulance. She believed that there was no one to remove the shackles. . . . [S]he feared that her son would not be able to be delivered. . . . Her trust in people had been eroded by her treatment, especially the shackling . . . .

(R. 134-1, Rept. of Jill DeBona, at PID# 3052–54.) In her opinion, DeBona diagnosed Plaintiff with post traumatic stress disorder (PTSD) and major depressive disorder, among other things. Comparing the testimony of Spetalnick, Torrente, and DeBona indicates a further factual dispute about the specific risk of harm to Plaintiff and the obviousness to the officers of harm to Plaintiff.[9]

---

[9]Despite the clear disagreement among the well-qualified experts on each side, the dissent sees no material factual dispute resulting from such fundamental disagreement. Dissent at 28–29. To be sure, Torrente and DeBona produced lengthier analyses of the risks that Plaintiff faced, but the specific and contradictory analysis of Spetalnick reflects a core disagreement about the material facts of the risks and obviousness thereof in Plaintiff's case. It may be that the jury will choose to credit the opinions of

As is the case with many claims of deliberate indifference, we find that there are fact issues that preclude the grant of summary judgment to Plaintiff. *See, e.g.*, *Nelson*, 583 F.3d at 534 ("The record suggests that a factfinder could determine that Turensky entirely disregarded her duty to balance these competing concerns."). The "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" necessary to resolve Plaintiff's claim "are jury functions, not those of a judge . . . on a motion for summary judgment." *Anderson*, 477 U.S. at 255. The jury's responsibility for weighing conflicting evidence is especially crucial where the ultimate issue is one that draws upon community values. *See Spaziano v. Florida*, 468 U.S. 447, 487 (1984) (Stevens, J., concurring in part and dissenting in part) (Juries "reflect more accurately the composition and experiences of the community as a whole, and inevitably make decisions based on community values more reliably."); *see also Galloway v. United States*, 319 U.S. 372, 397 (1943) (Black, J., dissenting) ("The founders of our government thought that trial of fact by juries rather than by judges was an essential bulwark of civil liberty."). Moreover, because much of the disputed proof in the record comes from declarations, there has been no opportunity for either side to test that proof through cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 46 (2004) (discussing the "vital importance" of cross-examination).

In light of the material factual disputes surrounding whether Plaintiff was shown to be a flight risk, whether Defendant's officers had any knowledge about a no restraint order, and the conflicting expert testimony about the ill effects of Plaintiff's shackling, we conclude that the district court improperly granted summary judgment to Plaintiff on her shackling claim. On remand, a jury will need to determine whether Plaintiff was a flight risk in her condition and whether Defendant had knowledge of the substantial risk, recognized the serious harm that such a risk could cause, and, nonetheless, disregarded it, *Harrison*, 539 F.3d at 518, recognizing that such knowledge may be established

---

Torrente and DeBona over Spetalnick, but once again, that is not our role to determine at the summary judgment phase. *See Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) ("[C]ompeting expert opinions present the classic battle of the experts and it is up to a jury to evaluate what weight and credibility each expert opinion deserves." (alterations and internal quotation marks omitted)); *see also Anderson*, 477 U.S. at 255.

through the obviousness of the risk. *Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); *see also Nelson*, 583 F.3d at 534 ("'[T]he obvious cruelty inherent in this practice [may] have provided [the defendant's officers] with some notice that [their] alleged conduct violated [the plaintiff's] constitutional protection against cruel and unusual punishment.'" (quoting *Hope*, 536 U.S. at 745)).

### D.       Denial of Breast Pump Claim

Plaintiff's second deliberate indifference claim is premised on Defendant's denying her a breast pump to allow her to express her breast milk postpartum. Defendant, based on its policy,  refused to allow Plaintiff to take the breast pump given to her by Hospital staff back to the jail with her.  This is because under Defendant's policy, a breast pump was not considered a "critical medical device."  Inasmuch as this is a typical interference with treatment claim, Plaintiff's breast pump claim fits neatly into the framework of our medical-needs jurisprudence.

For a medical-needs claim, such as this, the objective component is satisfied by showing the existence of a "serious medical need," which we have defined as either "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison*, 539 F.3d at 518 (quoting *Blackmore*, 390 F.3d at 897).  As before, a plaintiff can prove the subjective component by proving that the defendant had knowledge of the substantial risk, recognized the serious harm that such a risk could cause, and, nonetheless, disregarded it. *Id.*  This knowledge can be inferred from the obviousness of the harm.  *See Hope,* 536 U.S. at 738.

In granting summary judgment to Plaintiff on this claim, the district court relied on our opinions in *Byrd v. Wilson*, 701 F.2d 592 (6th Cir. 1983), and *Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991), to conclude that the Hospital staff's provision of the breast pump amounted to the breast pump being prescribed (i.e., a diagnosed medical need), and therefore Defendant was deliberately indifferent in refusing it to her. *Villegas*, 789 F. Supp. 2d at 916–17.  These cases are, however, distinguishable.  In

*Byrd*, we found that a *pro se* prisoner-plaintiff had made out a non-frivolous claim where after being "*diagnosed* as having post-hepatitic type cirrhosis of the liver for which medication and a low-sodium, high-protein diet were prescribed," two days elapsed before the prisoner was able "to get his medicine and his diet." 701 F.3d at 594–95 (emphasis added). In *Boretti*, a *pro se* prisoner-plaintiff had been treated for a gunshot wound three weeks prior to coming to the jail and had been given a treatment plan, which included daily changing of his bandages and daily provision of Motrin. 930 F.2d at 1151. Despite the existence of the plan, plaintiff never received any pain medication nor were his bandages changed. *Id.* at 1152. The *Borretti* court concluded (similar to *Byrd*) that the plaintiff had adequately pleaded his deliberate indifference claim and that factual disputes precluded summary judgment. *Id.* at 1155–56. In each of these cases, it is clear that a medical professional formally mandated a treatment plan. In the instant case, however, Plaintiff's evidence shows little more than the fact that Hospital staff handed her a breast pump as she was being discharged.

Absent proof that the breast pump was prescribed, as is necessary under a diagnosed medical-needs theory, Plaintiff must show that it was so obvious that even a layperson would recognize the need to provide Plaintiff with a breast pump. *See Harrison*, 539 F.3d at 518. Unlike her shackling claim, where Plaintiff pointed to specific statements by outside organizations and testimony from Defendant's officer, Plaintiff on this claim has only pointed to the opinion testimony of Torrente and DeBona, who both opined that a breast pump was necessary to allow Plaintiff to express her milk and relieve her breast pain. Such testimony regarding the harmful consequences of being denied the breast pump does not specifically speak to the obviousness of the risk to Plaintiff. Therefore, Plaintiff has failed to produce sufficient evidence to make out the objective component of her breast pump claim, and therefore, the district court improperly granted summary judgment to Plaintiff on this claim as well.[10]

---

[10]In light of our conclusion that the district court erred in granting Plaintiff summary judgment as to liability, we need not (and decline to) reach Defendant's issue alleging errors in the trial dealing with damages.

**II.     Reassignment**

Defendant has alleged that the district judge is biased against it and has requested that we order the case reassigned to another judge upon remand. Section 455(a) of Title 28 of the United States Code states that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Although this Court has the power, under 28 U.S.C. § 2106, to order the reassignment of a case on remand, we have stated that "[r]eassignment . . . is an extraordinary power and should be rarely invoked. Reassignments should be made infrequently and with the greatest reluctance." *Solomon v. United States*, 467 F.3d 928, 935 (6th Cir. 2006) (internal quotation marks omitted). In evaluating a request for reassignment on remand, we look at three factors: "(1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously expressed views or findings; (2) whether reassignment is advisable to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Id*.

All three of the factors militate against reassignment on remand. Defendant primarily argues that Judge Haynes made comments that indicate his disdain for Defendant's legal positions and its counsel. The Supreme Court has made clear that "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge . . . [unless] they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Johns v. Holder*, 678 F.3d 404, 408 (6th Cir. 2012) ("The judge's treatment of the evidence alone cannot support a claim of bias."). The comments cited to us do not display such extreme bias. Rather, they reflect that Judge Haynes, though at times critical in his comments, was attempting to enforce the parameters that he established for the trial. Moreover, Judge Haynes made a number of rulings favorable to Defendant. Though he did not rule in favor of Defendant on some crucial decisions, including the summary judgment decision that we are reversing today, that does not satisfactorily

demonstrate that Judge Haynes would not exercise fair judgment on remand. *See Liteky*, 510 U.S. at 555. Finally, the nature of this complex litigation with multiple experts and significant time spent in discovery resolves the third factor, that of judicial economy, against reassignment. *Cf. Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 239 (6th Cir. 2003) (refusing to reassign, in part, based on the "complex factual record" in the case). Therefore, we decline to order reassignment of this case on remand.

## CONCLUSION

For the reasons stated above, we **REVERSE** the district court's grant of summary judgment to Plaintiff and **REMAND** for further proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

HELENE N. WHITE, Circuit Judge, dissenting.  I respectfully dissent.  The district court determined on the parties' cross-motions for partial summary judgment that shackling Villegas during labor and postpartum recovery absent any indication that she was a flight risk or posed a risk of harm to herself or others, and denying her the breast pump hospital staff provided her on discharge, constituted deliberate indifference to a serious medical need.  The *material* facts–the facts that might affect the determination of Defendant's liability–were not in dispute.  R.119-1 at 23-24; PID 2612-13, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986).

A prison official is deliberately indifferent if he knows of and disregards a serious medical need or a substantial risk to an inmate's health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).  Deliberate indifference suits against prison officials must satisfy both objective and subjective requirements.  *Id.* at 837–39.

Villegas established that shackling created an objectively substantial risk of serious harm in two ways; by showing that her condition as a laboring and then lactating woman 1) resulted in medically prescribed treatment and 2) was obvious to lay persons as a serious medical need.  *See Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008); *See also Havard v. Wayne Cnty.*, 436 F. App'x 451, 454 (6th Cir. 2011) ("The birth of a child always presents a risk of serious injury to both mother and child."); *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 530 n.5 (8th Cir. 2009) (en banc) ("That labor is inherently risky is well known . . . and the hazards associated with labor and childbirth have entered the collective consciousness.").  "In 1994 [a federal district court in the District of Columbia] . . . held defendant prison officials liable, explaining that a prison official who shackles a woman in labor acts with 'deliberate indifference . . . since the risk of injury to women prisoners is obvious.' . . . . Nelson's protections from being shackled during labor had thus been clearly established by decisions of the Supreme Court and lower federal courts before September 2003."  *Nelson*, 583 F.3d at 532–33

(quoting *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 877 F. Supp. 634, 668–69 (D.D.C. 1994), *modified in part on other grounds*, 899 F. Supp. 659 (D.D.C. 1995).

The majority observes that Villegas's right to be free from shackling during labor must be balanced against Defendant's penological interest, and concludes that a question of material fact remained whether Villegas was a flight risk. I disagree.

First, deliberate indifference to a prisoner's serious medical need "can typically be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff." *Nelson*, 583 F.3d at 530, quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986) ("The deliberate indifference standard articulated in *Estelle* [*v. Gamble*, 429 U.S. 97, 105 (1976),] was appropriate in the context presented in that case because the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities," however, in the face of a prison disturbance "prison officials must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used.").

Here, Defendant maintained that Villegas's restraints were "consistent with" her medium-security designation and that illegal immigrants *in general* pose a danger of flight. But Villegas's medium-security designation did not take into account her late-term pregnancy or that she had gone into labor, nor was it based on any assessment of flight risk or risk of harm—it was automatic because of the Immigration and Customs Enforcement (ICE) detainer. Villegas was not being held for a crime of violence and had not been convicted of any crime. She was not individually assessed for flight risk or risk of harm to herself or others, and she had not engaged in any conduct evidencing such. *See Brawley v. Wash.*, 712 F. Supp. 2d 1208, 1219–20 (W.D. Wash. 2010) ("[T]here is no evidence in the record which indicated that shackling Plaintiff was justified by any legitimate penological concern. There is no evidence that Plaintiff was dangerous to herself or others. There is no evidence that she posed a flight risk.") Neither the ICE detainer's automatic designation of Villegas as "medium-security" nor

generalized evidence that illegal immigrants may pose a flight danger constitute "clear evidence" that Villegas was a security or flight risk.

Defendant's asserted penological interest in shackling Villegas while she was being transported to and then hospitalized, to maintain control over her in an *unsecured* facility,[1] suffers from another flaw. It is undisputed that at least one armed officer was present in the ambulance, at least one armed officer was present in the hospital room or outside the room at all times, and the maternity ward at Metro General Hospital is locked down at all times, that is, a nurse must unlock the doors and authorize persons to enter and exit. In order to flee or pose a threat, Villegas would have had to harm or elude armed officer(s) and the nurse authorizing entry and exit from the maternity ward charged with unlocking the doors.

Finally, I note that even though Villegas went through labor and gave birth without threat of escape or harm to anyone, Defendant's officers shackled her legs *together* postpartum while she walked, showered and used the toilet. This despite the fact that before the birth, a physician had ordered in writing that the shackles be removed. R. 86-17; PID 1609.

In sum, Defendant made no showing, and the facts belied, that shackling Villegas at any time was necessary, whether to effect their purported penological interest or otherwise.

Villegas satisfied the subjective component by demonstrating that Defendant's officers acted with deliberate indifference to her serious medical needs, i.e., knew of and disregarded the substantial risk of harm posed by shackling her during labor and postpartum. An Eighth Amendment claimant "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough to that the official acted or failed to act despite his knowledge of a substantial risk of serious

---

[1]R. 117 at 11, 14; PID 2577, 2580/Def.'s Reply Mem. in Support of Summ. J. (asserting that Villegas "was restrained because she was a medium-security inmate being taken to an *unsecured* facility. . . . Plaintiff simply cannot establish that DCSO's use of restraints in this case was not reasonably related to a penological interest.")

harm." *Harrison*, 539 F.3d at 518, quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

The district court's opinion sets forth the evidence establishing that Defendant's officers were aware of the substantial medical risks posed by shackling women while in labor and during postpartum recovery and disregarded it. *See* R. 119-1 at 6-7; PID 2596-96/Mem. Op. The majority concludes that "no testimony reveals that Defendant or its officers ever knew about the existence of [the no-restraint order]" and thus that a factual dispute existed regarding Defendant's officers' knowledge of a substantial risk of serious harm. Maj. Op. at 17. This determination erroneously presumes that Defendant's officers could know or become aware of the substantial medical risks shackling posed to Villegas only by entry of a written no-restraint order in her hospital file *and* the officers being "shown" the order. Even if this were the case, the record is clear that before the no-restraint order was placed in Villegas's file, hospital nursing staff had asked the officers to remove Villegas's shackles several times, had advised the officers that a no-restraint order was coming, and had advised officers of the high risk of blood clots after giving birth if the shackles were not removed.

The majority also concludes that conflicting expert testimony about the ill effects of Villegas's shackling raised a material factual dispute. Maj. Op. at 20. I disagree. Given the long-established law on shackling during labor and postpartum and the undisputed facts, I agree with the district court that the declaration of defense expert Dr. Spetalnick did not raise an issue of *material* fact. R. 119-1 at 34 n.9; PID 2624.

Dr. Spetalnick opined that restraining Villegas did not enhance the medical risks of deep venous thrombosis and pulmonary embolism or cause her excessive pain under the circumstance that she was restrained while in *latent* labor, the restraints were removed while she was in active labor, and remained off until hours after the delivery. He opined that the amount of ambulation recommended to prevent deep venous thrombosis "is not prevented by leg restraints as they were used" in Villegas's case; that although a leg restraint is a theoretical impediment in the case of an emergency, a restraint would not prevent, significantly impede, or make less accurate the vaginal

exam; and that although leg restraints can carry bacteria, there was no evidence that the use of restraints in this case created a significant infectious risk to Villegas.

Villegas's expert witness Dr. Torrente opined that shackling increased the risk of injury to both Villegas and her unborn child, that Defendant's officers subjected Villegas to unnecessary pain and suffering by shackling her after her water broke, and that Dr. Spetalnick's claim that Villegas was only in latent labor while shackled did not mean from a medical standpoint that Villegas was not in pain or that birth could not have progressed very quickly. Among Dr. Torrente's points unaddressed by Dr. Spetalnick were that shackling a woman after her water has broken is extremely dangerous because of a potential for umbilical cord prolapse, that once a woman's membranes have ruptured a cervical exam should be performed as soon as possible for potential umbilical cord prolapse, that a proper cervical exam and monitoring cannot be conducted while shackled, and that shackling may restrict or delay the ability to provide emergency medical care; that medical personnel need constant unrestricted access to a woman in labor for complications that can occur including a non-reassuring fetal heart tracing, for which the patient needs to be able to move to her left lateral decubitus position to increase blood flow to the baby; that a woman must be able to **freely** move and walk as often as possible to reduce risk of blood clots; that restraining a woman in labor and postpartum enhances the risk of injury to both woman and child because a woman should have **full range of movement of limbs** and **remain ambulatory** because of pain; that use of shackles during labor and postpartum is extremely unsanitary; and that the stress Villegas was placed under by shackling her increased the risk of injury to her and her unborn child. Dr. Torrente opined based on her review of Villegas's medical charts and personal history (i.e., having had three children), that she could have easily progressed to the final phase of labor while shackled in the ambulance or in the hospital room, and pointed to the fact that she progressed from being dilated at 3 cm to 10 cm in only two hours as support, noting that Dr. Spetalnick apparently overlooked this point.

Nor did Dr. Spetalnick rebut Villegas's expert and treating psychiatrist, Dr. DeBona, who stated that because Villegas's legs were shackled together while in the

ambulance, she could not move or open her legs and faced the terror that her baby might die, believing there was no one to remove the shackles and that her labor would be short, as it had been with two of her children.

Dr. Spetalnick did not address Defendant's officers' denial of the breast pump provided Villegas by hospital staff. Villegas's experts opined that if a woman is unable to express milk for several days because she does not have access to her child or to a breast pump, she can develop engorged breasts and mastitis, an infection of the breast tissue that results in severe breast pain, swelling, significant fever, rigors and chills. Dr. Torrente opined that Villegas's development of mastitis was almost certainly caused by her inability to use a breast pump in the hours and day following her release from the hospital.

The subjective component of a deliberate indifference claim goes to whether Defendant's officers were deliberately indifferent to substantial risks of serious harm posed by shackling. Defendant's experts did not address several of the serious medical risks to which Villegas's experts attested and did not rebut that shackling Villegas while en route to the hospital, during labor and postpartum, increased the medical risks of serious harm to Villegas and her unborn child. *See* R. 119-1 at 34; PID 2624/Dist. Ct. Op. I agree with the district court that no genuine or material factual dispute remained regarding whether Defendant's officers knew of and disregarded the substantial risks of harm posed by shackling Villegas during labor and postpartum and denying her the breast pump hospital staff gave her on discharge.