In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2363

STEVEN EDELMAN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

BELCO TITLE & ESCROW, LLC,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:11-cv-001121-DGW — **Donald G. Wilkerson**, *Magistrate Judge*.

ARGUED JANUARY 10, 2014 — DECIDED APRIL 25, 2014

Before FLAUM and EASTERBROOK, *Circuit Judges*, and
GRIESBACH, *District Judge*.*

FLAUM, *Circuit Judge*. The plaintiffs in this diversity case
are lenders who lost a lot of money on a bad real-estate in-
vestment. They sued the transaction's escrowee for a breach
of fiduciary duty under Illinois law. The plaintiffs argued

---

* Of the Eastern District of Wisconsin, sitting by designation.

that because the escrowee signed a form stating that it was
acting as the lenders' "agent" for the purposes of the escrow
and closing, the escrowee should have communicated to the
plaintiffs that they were not going to receive the first-priority
mortgage they had been promised by the real-estate devel-
opers. We agree with the magistrate judge that Illinois law
does not impose such a duty on an escrowee under the unu-
sual circumstances of this transaction, and affirm the grant
of summary judgment in favor of the defendant.

### I. Background

Plaintiffs Steven Edelman, Will Furman, and C. Bradford
Jeffries,[1] together with nonplaintiff investor Nam Yung Suh,
got into business with brothers Craig and John Nicholson
and one of the brothers' real-estate development firms, Ca-
seyville Sport Choice LLC ("Caseyville"). Caseyville was de-
veloping a multi-use real-estate project in Caseyville, Illinois
called Forest Lakes. The plaintiffs had invested with the Ni-
cholsons before. Edelman, Furman, and Suh had invested in
the Forest Lakes project before, too.

In 2007—as a result of the Nicholsons' solicitation—
Edelman, Furman, and Suh took a collective $1.6 million that
they had previously loaned to another of the Nicholsons'
firms, Nicholson Property Investments, and transferred that
amount to a new "Phase II" loan for the Forest Lakes project.

---

[1] Steven Edelman made his investment as an individual. Will Furman
made the investment as the trustee of the Furman-Doane Revocable
Trust, and C. Bradford Jeffries as the trustee of the C. Bradford Jeffries
Living Trust. The two trusts are the plaintiffs in this lawsuit—not Fur-
man and Jeffries themselves—but this detail does not matter to our anal-
ysis. We will refer to the three plaintiffs collectively throughout this
opinion.

Jeffries put in an additional $1.4 million. The Nicholsons promised the plaintiffs that in exchange for the Phase II loan, Caseyville would give them a first-priority mortgage on the residential portion of Forest Lakes. This promise was reflected in the deal's written Loan Agreement. Contrary to the Nicholsons' representations, however, the plaintiffs received only a junior mortgage. A mortgage on the residential portion of Forest Lakes (for $20 million) was already held by Meridian Bank, which acquired it back in 2005. And when the bank foreclosed on its mortgage in September 2009, the plaintiffs lost everything.

The defendant in this appeal, Belco Title & Escrow, LLC ("Belco"), is a title company formed by the law firm representing Caseyville, Belsheim & Bruckert, LLC ("Belsheim"). Belsheim created Belco to carry out title work for Caseyville's various Forest Lakes transactions—including the Meridian Bank mortgage in 2005. The law firm and the title company shared the same office and employees.

The plaintiffs and Caseyville executed the Phase II Loan Agreement in March 2007. Jeffries had already wire-transferred his $1.4 million to Caseyville in February; Edelman, Furman, and Suh's collective $1.6 million was "journaled" from Nicholson Property Investments to Caseyville on the day the parties signed the Loan Agreement. Throughout this process, the plaintiffs and the Nicholsons communicated directly with one another. The plaintiffs never communicated with Belco.

After Caseyville told Belco who the lenders were, Belco ordered a title search for the Phase II Forest Lakes property from Attorney's Title Guaranty Fund, Inc. ("ATG"), an underwriter that Belco regularly used for its real-estate clos-

ings. ATG returned a title search that revealed Meridian Bank's senior mortgage on Forest Lakes. After reviewing the title search, Belco gave "commitment preparation instructions" to ATG, and ATG prepared a title commitment which also disclosed Meridian Bank's mortgage. Either Belsheim or the Nicholsons (the record is unclear which) drafted the plaintiffs' mortgage agreement for the Phase II property. The mortgage agreement did not disclose the senior Meridian mortgage—it incorrectly stated that the Phase II property was "free and clear of all encumbrances."

The closing took place on April 25, 2007. It seems that only representatives from Belsheim and Belco attended. They executed a document titled the "Agency/Escrow Disbursement Agreement"; this document is relevant to the issue the parties litigate in this appeal. Here is the relevant portion:

> 1. We, the undersigned Seller and Buyer (or, for refinance transactions, the Borrower) direct you to make disbursements for this transaction, pursuant to the attached HUD-1 Settlement Statement ….

> 2. We understand and agree that for the purposes of this closing, Belco Title & Escrow, LLC (hereinafter "Closing Agent") is acting only as an agent of the lending institution, and does not represent either the Seller or the Buyer/Borrower as an attorney or in any other way. If the Closing Agent's representation of the lending institution gives rise to an apparent conflict of interest, the parties consent to and waive said conflict of interest. The parties understand and agree that all representations

> made to the Closing Agent by the Borrower may be made known to the lender and all documents executed and delivered to the Closing Agent may be known and delivered to the lender at any time hereafter ….

The Agency/Escrow Disbursement Agreement appears to be a stock form used by ATG. A Belsheim attorney signed the document on behalf of Caseyville, the "Borrower." A paralegal employed by Belsheim—but who was acting as a representative of Belco—signed the document on a line designated "ATG Member or other Authorized Signatory." There is no signature on the line for the "Seller," and there is no line at all for the "lending institution."

The Belsheim attorney signed the rest of the closing documents on behalf of Caseyville, and the paralegal signed the transaction's HUD-1 Settlement Statement on behalf of Belco. Belco had been holding certain settlement costs for the transaction in escrow. One of the Nicholson entities had provided the funds for these costs (once again, the record is not clear on this point). None of the plaintiffs' $3 million in loan funds were ever escrowed with Belco, as those funds had gone directly to Caseyville. On the day of the closing, Belco distributed the escrowed funds in accordance with the HUD-1 Settlement Statement, as it was directed to do in the Agency/Escrow Disbursement Agreement.

That same day, the Belco paralegal sent an email to Craig Nicholson telling him that the transaction had closed. The paralegal attached the title commitment, the Agency/Escrow Disbursement Agreement, the HUD-1 Settlement Statement, and the executed Phase II mortgage. Belco did not email any of those documents to the plaintiffs. In fact, Belco never once

contacted the plaintiffs—before, during, or after the closing. Craig Nicholson forwarded Belco's email to plaintiff Edelman, but he only included the mortgage with the email.

After the Forest Lakes project went under and Meridian Bank foreclosed on the property, the plaintiffs brought suit against Belsheim, Belco, and ATG in federal district court. (Interestingly, the plaintiffs did not sue the Nicholsons or Caseyville.) The plaintiffs alleged Illinois state-law claims of breach of fiduciary duty against Belsheim and Belco and negligent misrepresentation against ATG. Eventually, the plaintiffs dismissed their claims against the other two defendants. This appeal concerns only the plaintiffs' breach-of-fiduciary-duty claims against Belco.

The gist of the plaintiffs' claims is that Belco—as the self-avowed "closing agent" for the transaction—owed the lenders—Belco's principals—a fiduciary duty to look out for their interests in the transaction. Naturally, if Belco had been looking out for their interests, the plaintiffs reason, Belco would have tipped them off that they were not receiving the first-priority mortgage on the Forest Lakes property that they thought they were getting. The plaintiffs argue that Belco's failure to even communicate with them before the closing was a proximate cause of their going through with the deal and eventually losing their $3 million investment.

The magistrate judge, presiding by consent, granted summary judgment for Belco. The judge agreed that Belco was the plaintiffs' agent for the purposes of the escrow and closing. But he nonetheless found that under Illinois law, an escrow agent owes its lender-principal only the very limited duty "to act only according to the terms of the escrow instructions." *Edelman v. Belco Title & Escrow, LLC*, No. 3:11-cv-

1121-DGW, 2013 WL 2147627, at *3 (S.D. Ill. May 16, 2013) (quoting *Bescor, Inc. v. Chi. Title & Trust Co.*, 446 N.E.2d 1209, 1213 (Ill. App. Ct. 1983)). Reasoning that "[t]here is no question here that Belco complied with the terms of the escrow agreement in that the funds were disbursed according to [that] agreement," the court concluded that Belco fulfilled every obligation it owed to the plaintiffs as the transaction's escrowee. *Id.*

The magistrate judge further found that Belco did not owe the plaintiffs any additional duties derived from a source other than the Agency/Escrow Disbursement Agreement. The judge reasoned that Belco was not the plaintiffs' agent with respect to the loan itself: the Loan Agreement was between the plaintiffs and Caseyville, who executed it before Belco got involved, and the loan funds were never placed in escrow with Belco. Thus, having concluded that the relevant Illinois cases "tie the fiduciary duty owed by an escrow/closing agent to the actual instrument directing the actions of the agent," the judge held the plaintiffs could not show a promise Belco made to the plaintiffs that Belco failed to adhere to. *Id.* at *4. The plaintiffs appeal.

## II. Discussion

### A. Federal Rule of Civil Procedure 8(b)(6)

Before turning to the merits, we must dispense with a procedural issue. Belco never filed an answer to the plaintiffs' fourth amended complaint. The plaintiffs argue that as a result, Belco has admitted all of the allegations against it. We disagree.

The plaintiffs filed their initial nine-count complaint against the three defendants in December 2011. They filed an

amended complaint shortly afterward. The magistrate judge ordered the plaintiffs to file a second amended complaint to cure jurisdictional deficiencies; the plaintiffs obliged in January 2012. The second amended complaint alleged three counts of breach of fiduciary duty against Belco (one count per plaintiff), which are the claims before us here. In March 2012, Belco filed an answer responding to those counts and to other parts of the complaint that included information relevant to its liability.

In May 2012, the magistrate judge granted defendant ATG's motion to dismiss the three counts against it. The judge also granted defendant Belsheim's motion to dismiss the counts against Belsheim because the plaintiffs had failed to allege an element crucial to those claims. But the court allowed the plaintiffs to replead the Belsheim counts—so the plaintiffs filed a *third* amended complaint in June 2012. The third amended complaint did not amend the Belco counts, and it added no new allegations relevant to Belco's liability. But it did mistakenly include the dismissed counts against ATG. Accordingly, that same month, the plaintiffs filed a *fourth* amended complaint that properly excluded the ATG counts, but otherwise made no changes to the third version.

In March 2013, Belsheim and Belco filed a joint motion for summary judgment. At that point, the plaintiffs voluntarily dismissed Belsheim as a defendant. In their response to Belco, however, the plaintiffs raised Belco's failure to file an answer to the fourth amended complaint as a defense to summary judgment. Belco asked for leave to file the answer. The magistrate judge granted the request and required Belco to file its answer by May 16 (three days after the judge's order). But on May 16—without waiting for Belco's answer to

come in—the judge granted Belco's motion for summary judgment in a memorandum opinion. Apparently believing that the judge's action meant that no answer was necessary, Belco did nothing. The magistrate judge entered judgment on May 22, 2013.

Federal Rule of Civil Procedure 8(b)(6) holds that "[a]n allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied." The plaintiffs argue that by operation of this rule, the judge should have found that Belco admitted all of the complaint's allegations at the summary-judgment stage.

This argument overreaches. Belco may not have filed an answer to the plaintiffs' *fourth* amended complaint. Belco did, however, file an answer to the *second* amended complaint. The third and fourth amended complaints stated the very same allegations against Belco as the second amended complaint—the only allegations that changed during this time were against other defendants who have since dropped out of the case. Thus, at the time the judge ruled on Belco's motion for summary judgment, the fourth amended complaint had effectively reverted back to the one that Belco had already answered.

As support for their argument that Rule 8(b)(6) nonetheless requires the court to treat everything in the fourth amended complaint as admitted, the plaintiffs invoke our decision in *Modrowski v. Pigatto*, 712 F.3d 1166 (7th Cir. 2013). It does not help them. *Modrowski* merely noted that the defendants in that case may have admitted all of the allegations against them by not filing an answer to the plaintiff's amended complaint and filing a motion for summary judg-

ment instead. *Id.* at 1170. But unlike Belco, the *Modrowski* defendants never filed a responsive pleading at all. *Id.* The language in that opinion is inapposite.

As we have emphasized in similar circumstances, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48 (1957), *quoted in Pepper v. Vill. of Oak Park*, 430 F.3d 805, 812 (7th Cir. 2005) (granting summary judgment against the plaintiff despite the defendant's failure to file an answer responding to a new, related claim in the plaintiff's amended complaint). The purpose of a responsive pleading is to put everyone on notice of what the defendant admits and what it intends to contest. Belco undoubtedly did this, as it had previously answered all of the allegations against it. The plaintiffs cannot claim that they were prejudiced by Belco's oversight; "this [is] clearly a no harm, no foul situation." *Isby v. Clark*, 100 F.3d 502, 504 (7th Cir. 1996) (finding no abuse of discretion in the district court's not imposing a default judgment against defendants who failed to file a new answer after the plaintiff amended his complaint).

## B. Breach of fiduciary duty

We now proceed to the merits of the plaintiffs' breach-of-fiduciary-duty claim. We review the magistrate judge's grant of summary judgment de novo. *Ellis v. DHL Express Inc.*, 633 F.3d 522, 525 (7th Cir. 2011).

To succeed on this claim under Illinois law, the plaintiffs must show that Belco owed them a fiduciary duty, that Belco breached this duty, and that Belco's breach proximately

caused the plaintiffs' injury. *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000). If the evidence is undisputed (as it is here), the determination of whether a fiduciary duty exists is a question of law for the court to decide. *Wargel v. First Nat'l Bank of Harrisburg*, 460 N.E.2d 331, 334 (Ill. App. Ct. 1984). The magistrate judge granted summary judgment on the basis that the plaintiffs had not shown that Belco, as the escrowee for the transaction, owed them any of the duties they allege—namely, a duty to communicate with the lenders before the closing, to ask for instructions, and to disclose any material information that might cause them to reevaluate the deal.

In response, the plaintiffs argue that they and Belco were in a principal–agent relationship with respect to the Phase II loan. Insisting that Belco "admitted" in the Agency/Escrow Disbursement Agreement that it was the plaintiffs' agent for the transaction, the plaintiffs maintain that Belco owed them the fiduciary duties that any agent owes to its principal. *See, e.g.*, *Khan v. BDO Seidman, LLP*, 948 N.E.2d 132, 156 (Ill. App. Ct. 2011) ("[An] agent and principal are in a fiduciary relationship as a matter of law."); *Moehling v. W. E. O'Neil Constr. Co.*, 170 N.E.2d 100, 107 (Ill. 1960) ("[T]he agent sustains a position of trust toward his principal, and in all his transactions affecting the subject of his agency the law dictates he must act in utmost good faith and must make known to his principal all material facts within his knowledge which in anyway [*sic*] affect the transaction and the subject matter of his agency.").

We are puzzled by the plaintiffs' understanding that they and Belco shared a principal–agent relationship for the purpose of the loan transaction. As far as we can tell, the only

evidence of such a relationship is a single statement in the Agency/Escrow Disbursement Agreement that "for the purposes of this closing" Belco was "acting only as an agent of the lending institution." But as the plaintiffs themselves emphasized in their briefing and at oral argument, they never even saw the Agency/Escrow Disbursement Agreement during the time period at issue, let alone signed it. So the plaintiffs can hardly claim to have expressed their agreement to Belco's representation through that form.

Perhaps realizing this, the plaintiffs were quick to clarify that the Agency/Escrow Disbursement Agreement did not *create* the principal–agency relationship between the parties, but merely served as Belco's *admission* of it. But if the form was not the source of the agency, what was? The plaintiffs never told us, and we don't see how, on these facts, an agency relationship could have formed. "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006). The plaintiffs did not speak to Belco at any time before, during, or after the transaction's closing. (Indeed, the lack of communication is one of the things they are complaining about.) That being the case, the plaintiffs certainly never manifested their assent to Belco that Belco should represent their interests in the transaction.

The plaintiffs have a fallback argument. They argue that under Illinois law, escrowees owe a fiduciary duty to all parties to an escrow by default. But the case they cite for this proposition, *International Capital Corp. v. Moyer*, 806 N.E.2d

1166 (Ill. App. Ct. 2004), states only that "[e]scrowees have been found to owe a fiduciary duty both to *the party making the deposit* and *the party for whose benefit it is made.*" *Id.* at 1172 (emphasis added); *see also Bescor*, 446 N.E.2d at 1213 (same). The plaintiffs never deposited any of their loan funds with Belco. All three plaintiffs and Suh directed their collective $3 million to Caseyville before the closing took place, and the money was never escrowed. The only funds that were escrowed as part of this transaction—and thus controlled by Belco—were the transaction's settlement costs. Because one of the Nicholsons' firms provided the funds for these costs, the plaintiffs were not "the party making the deposit." And, as far as we can tell, the plaintiffs were not the intended beneficiaries of any of the funds that Belco held in escrow, either.

Even if Belco was in some sense an intended beneficiary of the escrowed settlement costs, however, the plaintiffs have not shown that Belco was deficient in its obligations as an escrow agent. Illinois law holds that "an escrowee, like a trustee, owes a fiduciary duty to act only according to the terms of the escrow instructions." *Bescor*, 446 N.E.2d at 1213. Here, the only "escrow instructions" were those contained in the Agency/Escrow Disbursement Agreement, which told Belco to distribute the escrowed funds in accordance with the transaction's HUD-1 Settlement Statement. The plaintiffs do not argue that Belco failed in this regard.

The magistrate judge interpreted Illinois cases like *Bescor* to mean that escrowees have but a single obligation: to act in accordance with the escrow instructions. In other words, the judge assumed that an escrowee cannot breach its fiduciary duty to the parties so long as the escrowee does not disobey

the instructions' explicit terms. We note that another district court has questioned this assumption. *See Home Loan Ctr., Inc. v. Flanagan*, 10 C 6787, 2012 WL 1108132, at *6 (N.D. Ill. Apr. 2, 2012) (reasoning, in interpreting Illinois law in a negligent-misrepresentation case, that "[t]he fact that an escrow agent must follow the closing instructions … does not preclude the existence of duties derived from other sources").

We need not address that issue of Illinois law here, however, because the plaintiffs told us at argument (repeatedly) that they are not contesting the magistrate judge's premise that escrowees have only a limited duty to follow their instructions. Instead, the plaintiffs argue that an escrowee's duty to follow the parties' instructions presupposes a duty to *ask* for instructions. Thus, in the plaintiffs' view, Belco had an obligation to contact the plaintiffs before the closing to find out how the plaintiffs wanted to proceed—for instance, to ask whether the plaintiffs still wanted to close the deal even if they would only receive a junior mortgage on the Forest Lakes property. But the plaintiffs have identified no Illinois cases holding that a closing agent is under an obligation to seek additional instructions from the transacting parties when the parties do not see fit to provide them. Again, Belco did not possess any of the plaintiffs' loan funds. And Belco was not a party to the Loan Agreement. If we hold that, as a matter of law, Belco became responsible for the plaintiffs' interests under these circumstances, that ruling would surely destabilize escrow transactions; the escrow agent would have no sure way of knowing what responsibilities it owed to whom.

This was an unusual transaction. The plaintiffs entered into a loan agreement and handed over the cash directly to

the borrowers without first ensuring that they were actually getting what they paid for. But Illinois law does not hold Belco responsible for the plaintiffs' interests under these circumstances.

The judgment is AFFIRMED.