NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0572n.06

No. 21-1061

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| KYISHA JONES, | ) | **FILED** |
| | ) | Dec 07, 2021 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| DAVID PEKOSKE, Acting Secretary, Department | ) | UNITED STATES DISTRICT |
| of Homeland Security, Individual and Official | ) | COURT FOR THE EASTERN |
| Capacity, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before: COLE, GIBBONS, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Kyisha Jones began working for the Department of Homeland

Security (DHS) and its predecessor, the Immigration and Naturalization Service (INS) in 2002.

She became a Customs and Border Protection (CBP) officer in 2003 and a CBP enforcement

officer in 2007. She twice sought a promotion in 2011 but was passed over. Believing that

discrimination had blocked the promotions, Jones filed suit against DHS, raising numerous claims.

After protracted litigation and multiple appeals, only Jones's Title VII sex discrimination claim

remained before the district court. The district court granted summary judgment to DHS. For the

reasons stated, we AFFIRM.

I.

Jones began working as an Immigration Maritime Inspector for INS in 2002. When DHS

was created in 2003, Jones became a CBP officer at the Port of Detroit. Then in 2007, Jones

applied for and received a position as an enforcement officer for CBP. An enforcement officer focuses on complex immigration violations.

Jones at times acted as team lead for her unit. Team lead was not a permanent position or a supervisory role, but rather a rotating assignment. As team lead, Jones was responsible for organizing the shift, determining who would be working on which cases, and receiving and passing on directions from the supervisor. Given her high level of expertise, Jones also trained other members of her unit. She also was the Lead Post Advisor for the CBP Explorer Program, where she helped with community outreach.

In 2007, Jones was suspended for five days because she failed to work an overtime shift as directed. At the time, it was CBP policy that if CBP needed an employee to work overtime, overtime was assigned to the officer who had the lowest overtime earnings. Because she had the lowest overtime earnings on a day in summer of 2007 when overtime was needed, two supervisors ordered Jones to work overtime after her normal shift. Jones finished her normal shift but, instead of working the overtime as directed, she "just left." According to Jones, she was exhausted from having worked an on-call shift and a regular shift and could not physically work the overtime shift and then work on-call the next morning. Jones also notes that after her suspension, the overtime policy was deemed unfair and was changed.

In 2011, CBP began soliciting candidates for supervisory positions. Promotions in CBP are governed by the Merit Promotion Plan. CBP's Hiring Center evaluates applicants and assigns a rating based on "their job-related knowledge, skills, and abilities." The Hiring Center selects the best-qualified candidates and refers them "to the selecting official in score order." CBP conducted

two rounds of hiring for supervisory positions, one in June 2011 and one in August 2011.[1] The Hiring Center compiled a best-qualified list for each round. Jones was on the best-qualified list both times.

Jones was not promoted during either round. In the June 2011 round, CBP promoted four male officers and one female officer. Three of the men, Brandon, Neil, and Patrick,[2] will be discussed later. In the August 2011 round, CBP promoted one male officer, Danny, and one female officer, Electrica. Danny, like Jones, had a prior disciplinary suspension. Roderick Blanchard, the Port Director of the Port of Detroit, explained that he did not recommend Jones for a promotion because "while Ms. Jones possesse[d] excellent knowledge, skills[,] and ability . . ., her contentious nature cut against her." In addition, Jones's disciplinary suspension played a big role in Blanchard's decision; he thought it indicated a lack of leadership and an unwillingness to "follow direction and contribute to an efficient operation."

Jones filed an Equal Employment Office complaint with DHS, arguing that her non-promotion in August 2011 was the result of sex discrimination. The Equal Employment Opportunity Commission (EEOC) determined that CBP had not discriminated against Jones based on sex and dismissed her complaint. Jones followed up with another EEOC complaint a year later, this time alleging sex discrimination in the June 2011 promotional process too. The EEOC dismissed that complaint as well.

Jones filed suit against the Director of DHS. She initially raised twenty-four claims. After lengthy litigation below and in this court, her claims were whittled down to one—a sex

---

[1] There is some discrepancy over when the promotions occurred, but for ease, we refer to the promotional dates as June 2011 and August 2011, as the parties do in their briefs.

[2] To preserve the anonymity of the other applicants, the district court and parties have used only their first names. We do the same.

discrimination claim under Title VII. The district court granted summary judgment to DHS on that claim. This court reversed that order, however, concluding that the district court had failed to allow sufficient discovery. *Jones v. Johnson*, 801 F. App'x 338, 350 (6th Cir. 2020). On remand and after additional discovery, DHS again moved for summary judgment. The district court granted the motion. Jones appeals, raising three claims in support of reversal.

## II.

### A.

Jones first argues that the district court should have denied DHS's motion for summary judgment because DHS admitted all the allegations in the complaint when it failed to file an answer. The district court disagreed with Jones, noting that "[t]his case did not proceed in a traditional fashion, through no fault of [DHS]," and relying on its "wide discretion" in managing its own docket, "the court implicitly suspended [DHS's] obligation to file an answer."

Ordinarily, "[a] defendant must serve an answer . . . within 21 days after being served with the summons and complaint." Fed. R. Civ. P. 12(a)(1)(A). That time is extended when a motion to dismiss is filed, but once the motion is denied, a defendant has 14 days to file an answer. Fed. R. Civ. P. 12(a)(4)(A). If a defendant fails to file an answer as required, the allegations in the complaint, "other than one[s] relating to the amount of damages" are deemed admitted. Fed. R. Civ. P. 8(b)(6).

There are, however, some exceptions to Rule 8(b)(6)'s admission rule. For example, the failure to file an answer does not mean that a defendant admits legal conclusions. *See Thompson v. DeWine*, 976 F.3d 610, 616 n.5 (6th Cir. 2020) (per curiam); 5 Wright & Miller, Federal Practice and Procedure § 1279 (4th ed.). And the failure to file an answer may be harmless, most usually where the plaintiff is consistently on notice that the defendant is disputing the facts. For example,

the plaintiffs in *Thompson* argued that by not filing an answer, the defendants had admitted the "claim from the complaint that it was 'impossible' for them to collect [the] signatures" needed to get an initiative on a ballot. 976 F.3d at 616 n.5. The court questioned whether "impossibility" was a factual allegation, as opposed to a legal conclusion, that could be deemed admitted. *Id.* But in the end, it did not matter because the defendant had "consistently argued, both before the district court and before [our court], that it wasn't impossible for Plaintiffs to collect signatures." *Id.*; *see also Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 436 (5th Cir. 1987) (the defendant's failure to answer did not admit "actual malice" because there was no unfair surprise and thus no harm; the defendant's "motion for summary judgment, while not a pleading responsive to a complaint, gave [the plaintiff] plain notice that the question of actual malice was a matter to be litigated" (footnote omitted)); *Edelman v. Belco Title & Escrow, LLC*, 754 F.3d 389, 394–95 (7th Cir. 2014) (rejecting the plaintiff's Rule 8(b)(6) argument because he could not show that he was "prejudiced" by the failure to file an answer); *Vandewarker v. Cont'l Res., Inc.*, 917 F.3d 626, 630 (8th Cir. 2019) (defendant's failure to answer an amended complaint caused no harm because "the parties presented extensive summary judgment briefing before the district court" and the defendant's "first answer responded to all of the substantive allegations made against it").[3]

---

[3] In support of her position, Jones offers *Dunbar v. Prelesnik*, an unpublished order from this court in which a panel recognized that "[w]hile filing a motion to dismiss tolls the deadline for a defendant to file an answer to a complaint by operation of Rule 12(a)(4)(a), Rule 56 has no similar provision for summary judgment motions." 2016 WL 11618615, at *2 (6th Cir. Oct. 27, 2016). So, in *Dunbar*, the defendants' failure to file an answer within fourteen days of the denial of their 12(b)(6) motion "constituted an admission of all the complaint's factual allegations pursuant to Rule 8(b)(6)." *Id.* There is no indication that the panel was presented with the argument that any failure to file an answer was harmless. While this unpublished order seems to support Jones's position, the rest of the story does not. On remand in *Dunbar*, the defendants filed an answer; the district court accepted it pursuant to Federal Rule of Civil Procedure 55(c), which our court read as "permit[ting] the court to set aside an entry of default for good cause, thus allowing it to treat a late-filed answer as curing admissions." *Dunbar v. Prelesnik*, 2019 WL 5079253, at *2 (6th Cir. May 7, 2019). We found no abuse of discretion in allowing the defendants to cure their "technical"

These cases show that the failure to file an answer does not necessarily preclude a defendant from contesting the facts stated in the complaint. Jones must have suffered some harm from the failure to file, but she has never alleged any. Nor do we see any from the record. Jones's amended complaint contained twenty-four claims. After the district court granted DHS's motion to dismiss, filed in lieu of an answer, this court affirmed as to all claims except Jones's sex discrimination claim. On remand, then, the litigation focused on a single claim. Throughout the protracted litigation occurring thereafter, DHS filed multiple motions for summary judgment, clearly disputing Jones's version of the events found in her amended complaint. And the numerous discovery disputes, and the discovery taken, focused entirely on proving or disproving those allegations. Jones knew what was in dispute, and she faced no "unfair surprise." *Trotter*, 818 F.2d at 436. This was "clearly a no harm, no foul situation." *Edelman*, 754 F.3d at 395 (citation omitted).

B.

We now turn to Jones's argument that the district court erred by granting summary judgment to DHS on her Title VII sex discrimination claim. We review the district court's summary judgment decision de novo. *Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 275 (6th Cir. 2018). "[S]ummary judgment is warranted only if 'there is no genuine issue as to any material fact' and 'the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a) and *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)).

---

admissions. *Id.* "Because the defendants had defended the case by filing motions to dismiss and for summary judgment and by answering the complaint, the district court's decision to relieve the defendants of their admissions in this manner was not an abuse of discretion." *Id.* *Dunbar* stands for the proposition that the failure to file an answer may be curable and thus harmless.

A plaintiff pursuing a Title VII discrimination case may proceed under either a single-motive or a mixed-motive theory. *See Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021). Jones focuses primarily on a single-motive theory. A single-motive claim "can be supported with direct or indirect evidence." *Id.* Here, Jones relies on indirect evidence. Accordingly, the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973), burden-shifting analysis applies. *Id.* To make a prima facie case for failure to promote, the plaintiff "must show that (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812–13 (6th Cir. 2011). If the plaintiff can establish a prima facie case, the burden shifts to the employer "to articulate a legitimate nondiscriminatory reason for failing to promote the plaintiff to the position sought." *Id.* at 814. If the employer meets this burden, "the presumption of discrimination is gone and the plaintiff must demonstrate that the employer's proffered nondiscriminatory reason was not the true reason for the employment decision, but rather a pretext for discrimination." *Id.* at 815.

We assume for the purposes of this appeal that Jones has established a prima facie case. And Jones does not dispute that DHS has offered legitimate, nondiscriminatory reasons for failing to promote her—that Jones "received discipline for failing to obey a supervisor's order and she lacked the leadership skills of the candidates promoted." Appellee Br. at 30. So we focus exclusively on pretext.

To show pretext, the plaintiff normally must establish that the employer's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or

(3) was insufficient to warrant the challenged conduct." *Provenzano*, 663 F.3d at 815 (quoting

*Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc)). Here, Jones's

pretext argument rests on her alleged superior qualifications compared to those who received a

promotion. So she must show either that: (1) she "was a plainly superior candidate, such that no

reasonable employer would have chosen" the other candidates over her, or (2) she "was as

qualified as if not better qualified than the successful applicant[s], and the record contains other

probative evidence of discrimination." *Id.* (quoting *Bartlett v. Gates*, 421 F. App'x 485, 490–91

(6th Cir. 2010)).

Jones argues that she was plainly superior to several of the men who were promoted,

specifically naming Brandon, Patrick, and Neil from the first round of promotions, and Danny

from the second.[4] We begin with Danny because he is Jones's closest comparator.

Jones had about nine years' experience in immigration when she sought a promotion. She

had been an enforcement officer since 2007, handling complex immigration violations. Jones at

times acted as team lead for her unit. Given her high level of expertise, Jones trained other

members of her unit. She also was the Lead Post Advisor for the CBP Explorer Program, where

she helped with community outreach. According to Blanchard, "Jones possesse[d] excellent

---

[4] The parties dispute which promotions are at issue. DHS made promotional decisions in June 2011 and August 2011. Jones says that these promotional decisions were all part of a single process. DHS argues, however, that they were distinct promotional decisions and that Jones failed to exhaust her administrative remedies with the EEOC for the June 2011 promotional decision. Consequently, says DHS, Jones's sex discrimination claim related to the June 2011 promotional decision is not properly before us. *See* 29 C.F.R. § 1614.105(a)(1); *see also McFarland v. Henderson*, 307 F.3d 402, 406 (6th Cir. 2002). Title VII exhaustion requirements, however, are not jurisdictional prerequisites. *See McFarland*, 307 F.3d at 406. So we need not address exhaustion unless it would change the result. We decline to address exhaustion because, even if we consider the June 2011 promotions, Jones has failed to establish sex discrimination.

knowledge, skills[,] and ability." As of August 1, 2011, she had received seven cash performance awards for her work.

Danny had about eight years' experience at CBP when he was selected. He came to DHS after a long career as a homicide detective and sergeant with the Detroit Police Department. He was part of the Anti-Terrorism Contraband Enforcement Team. He also worked as team lead. He received five cash performance awards for his work.

Both Jones and Danny had prior disciplinary suspensions. As described previously, Jones received a five-day suspension in 2007 for failing to work an overtime shift as directed. Danny received a three-day suspension in 2009 for failing to properly report outside employment.

On paper, the resumes look similar. So why did CBP promote Danny and not Jones? Blanchard gave several reasons. He thought Jones "was not the best applicant at th[e] time given the other applicants' superior communication and leadership skills." Jones had a "contentious nature" and did "not always work with her supervisors and [was] known to unnecessarily challenge them." In his deposition, Blanchard elaborated that assistant port directors told him that when Jones "disagreed with a supervisor's decision, she'd become argumentative." She also complained about having to do work other than immigration enforcement, even though such work was a necessary part of the job; this was concerning to Blanchard because he looked "not only [for] leadership but someone that's willing to work in all areas because going from [enforcement officer] to a supervisor, you're going to be working in all the areas." Her suspension played a significant role. Blanchard thought it "was not a technical violation" and demonstrated that Jones lacked a "leadership quality."

David Beculheimer, the Assistant Port Director, found it "difficult to get past the incident where [Jones] walked off and left her coworkers short," noting that it was "a huge problem." While

Jones "was super smart" and "really knew immigration law," Beculheimer thought walking away from the shift showed that "she was kind of a little bit more concerned about herself than she was about the accomplishment of this mission." Beculheimer also explained that Jones "complained a lot," whereas the others "didn't complain, they just did it." Jones was very good at immigration work but did not enjoy, and expressed discontent about, doing other aspects of the job. According to Beculheimer, Jones had been unwilling to fill in for another officer who was on maternity leave, despite being specifically asked to do so by her supervisor.

On the other hand, Blanchard said Danny had "excellent communication and leadership skills," and was known to be a "go-to" person when issues arose. He worked with "supervisors to ensure a smooth operation." His "excellent work as a CBP [officer] led to his assignment to the Anti-Terrorism Contraband Enforcement Team." Blanchard considered Danny's suspension to have been for a "technical violation" that did not indicate any honesty or integrity issues. Beculheimer explained that Danny "really knew his stuff" and had "retired from the Detroit Police Department, homicide detective and was a sergeant, so really a lot of leadership there." Beculheimer thought Danny was "a great choice" because "[h]e really brought a lot of experience and knowledge of leadership from his days with [the Detroit Police Department]." Another one of Danny's supervisors, John Nowak, said Danny was "exceptional" and "possesse[d] the natural ability to lead others." Nowak stated that Danny had no negative aspects or weaknesses regarding his job performance, honesty, or integrity.

The evidence and testimony thus show that Jones was not a plainly superior candidate to Danny. The resumes were quite similar on paper. Danny, however, had leadership skills that Jones lacked. And while both had a prior disciplinary problem, Danny's superiors viewed his

violation as technical, whereas they viewed Jones's failure to stay to work her overtime shift as significant and a demonstration of poor leadership.

In response, Jones highlights her cash performance awards. While Jones had seven performance awards to Danny's five, we do not believe the disparity is so great as to suggest that she was the "plainly superior" candidate. In any event, as DHS notes, the Merit Promotion Plan explicitly provides that the "[m]ere possession of a specific number of awards . . . will not, in and of themselves, be factors in the evaluation process and will not be used to mechanically increase ratings."

Jones's main contention is in regard to the disciplinary actions. Despite Blanchard's conclusion that Danny's was a mere "technical violation," and despite both Blanchard and Beculheimer believing that Jones's violation demonstrated a lack of leadership, Jones argues that Danny's violation was more serious. First, Jones says that the policy that required her to work overtime changed shortly after her discipline, suggesting that her violation was not so bad. But Jones misses the point. Whether the policy was fair or not, it was Jones's decision to disobey direct orders that led Blanchard and Beculheimer to believe she might not be fit to lead.

Second, Jones tries to paint Danny's violation as much more than a "technical violation." She says that, since the beginning of his employment in 2003, he had been in continuous violation of the no-outside-employment rule. But that is not what the disciplinary official Christopher Perry and Blanchard determined. And CBP's Table of Offenses and Penalties clearly provides that Jones's violation was more serious than Danny's. Her violation (an E(2) violation for "[w]illful and intentional refusal to obey a proper order of a superior") carries a punishment range of a "5-day suspension to removal," whereas Danny's violation (a P(3) violation for "[f]ailure to obtain prior written approval before engaging in outside employment") carries a punishment range of a

"[w]ritten reprimand to 3-day suspension." The evidence therefore does not support Jones's assertion that Danny's violation was more serious. CBP policy and Jones's supervisor all concluded to the contrary. Jones has not shown that she was a plainly superior candidate to Danny.

As for the four men who were promoted in June 2011, Jones mentions three: Brandon, Patrick, and Neil. We consider Brandon and Neil only. Jones offers a cursory analysis of why she was plainly superior to the other candidates beyond Danny, but she does discuss Brandon and Neil's qualifications in the fact section of her opening brief. Regarding Patrick, however, she makes only two off-hand mentions in her opening brief and one in her reply brief; beyond that, she offers no further discussion about him or his qualifications. As a result, Jones has forfeited any argument related to Patrick. *See Wedgewood Ltd. P'ship I v. Township of Liberty*, 610 F.3d 340, 348 (6th Cir. 2010) (recognizing that a party forfeits an argument made "in a perfunctory manner unaccompanied by some effort at developed argument" (quotation marks omitted)).

As for Brandon and Neil, Jones's prior discipline hurts her. Brandon and Neil had no disciplinary history, which is an important distinguishing factor. And beyond that, their qualifications are sufficiently similar to Jones's, such that she cannot show that she was the plainly superior candidate. Like Jones, Brandon and Neil each had nine years' experience at the time of the promotions. Jones emphasizes her cash performance awards, but she has fewer than either Brandon or Neil (seven to their nine each, as of August 1, 2011). Though Jones notes that she was team lead over Brandon and Neil, Brandon also served as team lead. Brandon also had been "previously selected to serve as temporary Supervisory CPB Officer[] and excelled at the job." According to Blanchard, Brandon and Neil had "excellent communication and leadership skills, which [he] consider[ed] to be of utmost importance for selection to the Supervisory Officer position." Beculheimer thought Neil was a "great officer" and "probably one of our top producing

officers," noting that "[h]is work quality was fantastic and he also, whatever you needed him to do, he would do it with little or no complaint." Beculheimer said that he was pleased Brandon and Neil were promoted as "they were top notch officers [who] showed great leadership skills." As a result, the record evidence does not establish that "no reasonable employer would have chosen" Brandon or Neil over Jones. *Provenzano*, 663 F.3d at 815.

Having failed to establish a genuine issue of material fact that she was plainly superior to her comparators, Jones must show that she "was as qualified as if not better qualified than the successful applicant, and the record contains other probative evidence of discrimination." *Id.* Even assuming that she was as qualified as her comparators, she has failed to provide other evidence of sex discrimination.

Jones attempts to show sex discrimination by pointing to the treatment of two other female candidates, Electrica and Emily. Regarding Electrica, Jones asserts that there was no justification for her being promoted in the second round, rather than the first. We question whether Jones can even make this argument, given her continued assertion that the first and second stages were all one promotional process. If that were so, there could be no meaningful distinction between being promoted in August instead of June 2011. But, in any event, Jones's argument fails. Her briefing asserts, without citation, that "Blanchard was left speechless when asked for a reason why Electrica was not promoted [in June] ahead of [the other] men." Appellant Br. at 70. But the record does not support this assertion. Instead, Blanchard could not recall "exactly . . . why one was picked over the other because the announcements were very close." He explained that "[s]ometimes comparisons are so close," and he believed that it might have been a matter of timing—he thought Electrica was on special assignment in Detroit during the first round of promotions. Jones offers

no rebuttal to Blanchard's testimony; and thus, Electrica's promotion is not evidence of sex discrimination.

Neither is Emily's case. It is true that Emily was not promoted in June or August 2011. Jones says that this shows sex discrimination because Emily's experience was "stellar." *Id.* There is no doubt that Emily was a strong candidate. Blanchard agreed. But he offered a perfectly reasonable explanation for why she was not promoted in 2011, one that Jones has not rebutted. At the time of the 2011 promotions, Emily "had very little land border experience" and needed "to become proficient [to] where [she knew] the operation well enough that [she] could actually run a shift and be a supervisor." Simply, "she needed more time in the port before she was . . . ready to be a supervisor." Ultimately, Blanchard recommended Emily for promotion in 2012, and she was promoted that year. We therefore disagree that Emily's promotion in 2012 constitutes "other probative [record] evidence of discrimination." *Provenzano*, 663 F.3d at 815.

Jones has failed to establish pretext, and the district court did not err by granting summary judgment to DHS on Jones's Title VII single-motive sex discrimination claim.[5]

C.

Finally, Jones raises a claim of judicial bias against the district court judge. Claims based on personal bias or prejudice are typically brought pursuant to 28 U.S.C. §§ 144 and 455(b)(1),

---

[5] For the same reasons, Jones's mixed-motive sex discrimination claim fails. To survive summary judgment on a mixed-motive claim, Jones must show that sex "was *a* motivating factor for the defendant's adverse employment action." *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008)). While the burden at the summary judgment stage is not onerous, the plaintiff must "produce[] evidence from which a jury can logically infer" that discrimination was a motivating factor. *White*, 533 F.3d at 404. In her opening brief, Jones offers no new arguments for her mixed-motive theory, relying instead on the same arguments she made for her single-motive theory and primarily on the case of Electrica. For the reasons discussed above, we conclude that a jury could not logically infer that sex discrimination was a motivating factor in the promotions. *Id.*

which provide for the recusal of a biased judge. But to proceed under either statute, one must timely file in the district court. *See United States v. Flowers*, 818 F.2d 464, 468 (6th Cir. 1987); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 862–63 (6th Cir. 1992). Jones admits that she did not seek recusal in the district court. Consequently, she has forfeited the right to now assert a § 144 or § 455 claim. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008); *see also United States v. Towns*, 913 F.2d 434, 443 (7th Cir. 1990).

After DHS noted this omission on appeal, Jones's reply brief disclaimed reliance on § 144 or § 455. She instead cast her claim as seeking reversal of a biased judgment under the federal common law. She acknowledges that success on such a claim is a "rare occurrence." Reply Br. at 8. And she acknowledges that she never specifically raised a common law claim below. But even if we assume that Jones adequately preserved her claim below, she has not shown bias.

Though she casts her claim as arising under the common law, the cases Jones cites suggest a claim arising under the Due Process Clause. Due process requires "[a] fair trial in a fair tribunal." *In re Murchison*, 349 U.S. 133, 136 (1955). "Fairness of course requires an absence of actual bias in the trial of cases." *Id.* The bias or prejudice "must be 'personal' bias or prejudice as distinguished from a judicial one." *Knapp v. Kinsey*, 232 F.2d 458, 466 (6th Cir. 1956) (internal citation omitted). "Adverse rulings during the course of the proceedings are not by themselves sufficient to establish bias and prejudice." *Id.*

Jones offers a long list of grievances against the district court judge. But they do not show personal bias against Jones; instead, they evidence her disagreement with judicial decisions. And most of the purportedly biased statements Jones highlights are taken out of context.

For example, Jones points to two sentences as evidence that the district court judge's mind was predetermined. In a discovery order, the district court analyzed the merits of Jones's sex

discrimination claim to determine what discovery was necessary. When discussing Jones's ability to show a prima facie case, the district court rejected DHS's argument that Jones and her comparators lacked similar qualifications. The court explained, "A detailed comparison of these suspensions is inappropriate in assessing Plaintiff's *prima facie* case. Rather, this comparison is a part of Plaintiff's burden to show pretext, *should the court's inquiry progress that far.*" (Emphasis added.) While Jones offers the final clause as evidence of bias, it is hard to imagine a more innocuous statement. The district court was making the point that, under the *McDonnell Douglas* framework, it would get to pretext only if Jones could make a prima facie case and DHS could offer a legitimate, nondiscriminatory reason for the adverse action.

Similarly innocuous is a line Jones highlights from the district court's final opinion and order: "As the court thoroughly analyzed in its October 2018 opinion granting summary judgment, no genuine dispute of fact exists that Defendant's non-discriminatory justifications are pretextual." According to Jones, this shows that the district court had made up its mind and refused to reconsider its earlier decision or review the new evidence obtained from additional discovery. This is not the case. The subsequent pages of the opinion show that the district court relied exclusively on evidence the parties offered *after* the October 2018 opinion.

Jones also points to confusion regarding the deadline to file a response brief to DHS's motion for summary judgment. She says the court and the parties agreed that she would have five weeks to respond, but the court issued an order requiring her to respond eight days earlier than Jones's expected deadline. When brought to the court's attention, the court explained, "Plaintiff asserts the court granted her five weeks to file a response at an August 19 telephonic conference, and that it was memorialized on the record." But the court had "no independent recollection of such an extension, and the last status conference was not conducted on the record"; nor did the

scheduling order provide for a five-week response deadline. Nonetheless, the court modified the deadline, requiring Jones to file her brief two days before her desired five-week deadline. In context, this exchange and two fewer days to file a brief do not indicate bias.

Most of the remaining charges against the district court go to its desire to limit discovery. But these are quarrels with the district court's judicial decisions, not evidence of personal bias against Jones. *See Knapp*, 232 F.2d at 466. The same can be said of the remaining allegations. Jones has thus failed to establish judicial bias.

\* \* \*

We AFFIRM.